```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF IOWA

IN RE:                           )
                                 )      Chapter 7
ROGER P. GEHL,                   )
                                 )
     Debtor.                     )      Bankruptcy No. 04-00102
-------------------------------
LAND O'LAKES FARMLAND            )
FEED LLC                         )
                                 )      Adversary No. 04-9063
     Plaintiff,                  )
                                 )
vs.                              )
                                 )
ROGER P. GEHL,                   )
                                 )
     Defendant.                  )
```

**ORDER RE: COMPLAINT TO DETERMINE DISCHARGEABILITY OF
DEBT AND OBJECT TO DEBTOR'S DISCHARGE**

This matter came before the undersigned for trial on March 8, 2005. Plaintiff Land O'Lakes Farmland Feed L.L.C. ("LOLFF") was represented by Attorney Jonathan Miesen. Debtor Roger Gehl appeared in person with Attorney Francis Henkels. After trial, the Court took this matter under advisement. The time for filing briefs has now passed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

**STATEMENT OF THE CASE**

Plaintiff's complaint seeks to except its claim from Debtor's Chapter 7 discharge under § 523(a)(2)(A) for fraud or false representations, § 523(a)(4) for fraud in a fiduciary capacity, and § 523(a)(6) for willful and malicious injury by a debtor to another entity. Plaintiff also seeks denial of discharge under § 727(a)(4) for knowingly and fraudulently making a false oath or account in connection with the bankruptcy case. Plaintiff withdrew its § 523(a)(4) claim at the close of trial. The remaining issues are whether Plaintiff's claim should be excepted from discharge under either § 523(a)(2)(A) or (a)(6) and whether Debtor's discharge should be barred under § 727(a)(4).

**FINDINGS OF FACT**

This matter arises from a dispute between Debtor and Land O'Lakes Farmland Feed, L.L.C. over two shipments of weaner pigs. On June 24, 1999, Debtor entered into a "Pig Finder MAP–Multiple Fill Purchase Agreement" ("Agreement") with Farmland Industries, Inc. The Agreement provided that Farmland, through its supplier BKK Enterprises Inc., would deliver approximately 500 weaner pigs per month to Debtor for the duration of the Agreement. Section A.1 of the Agreement provided that the "total number of pigs to be ordered . . . under this Agreement shall be 13,000 head." Exhibit A of the Agreement contains an "anticipated delivery schedule" depicting monthly deliveries (with double deliveries in January of 2000 and 2001) of 500 weaner pigs per month from June 24, 1999 through May 10, 2001.

The Agreement provided that upon receipt of his monthly shipment of weaner pigs, Debtor was to make payment "to the designated field agent of Farmland no later than 48 hours after the delivery of the pigs." Additional payment terms were contained in the "Credit Application/Agreement" ("Credit Agreement") which the parties executed in conjunction with the Agreement. Around September 1, 2000, in consideration for LOLFF's purchase of Farmland Industries, Inc., Farmland assigned its interest in certain assets, including its agreements with Debtor, to LOLFF.

The relationship between the parties was amicable from the inception of the Agreement through the summer of 2000. Until the fall of 2000, Debtor was generally satisfied with the condition of the weaner pigs supplied under the Agreement. During October and November of 2000, Debtor received two batches of pigs, numbers 22 and 24, which experienced what he believed to be higher than expected mortality rates. The weaner pigs in these shipments were infected with the Porcine Reproductive & Respiratory Syndrome ("PRRS") virus. At trial, Plaintiff offered testimony from Mr. William Starke, D.V.M, a Pig Sourcing Team Manager for LOLFF, stating that PRRS is a common problem for pig producers and that the virus can be treated with a vaccine. Mr. Starke also opined that it is common for a pig producer operating under the same conditions as Debtor to experience loss rates of around 8%. Debtor's actual loss rates for batches 22 and 24 were between 10%-33%. Debtor testified that he viewed these batches as "substandard" and that he wanted to receive compensation from LOLFF for his loss.

Section B.6 of the Agreement provided that "Farmland has no liability for pigs which first show an observable, clinical sickness more than 48 hours after delivery." It is undisputed that Debtor did not discover that batches 22 and 24 were infected until after the 48 hour deadline had lapsed. Under the terms of the Agreement, Debtor's "sole remedy" for pigs displaying signs of clinical sickness was to make a claim under the "Adjustment Policy" within the first 48 hours of delivery. Further, the Agreement stated that the pigs were supplied "as is" without any warranties of fitness or use. Devoid of any contractual remedy for what he believed to be a "substandard" product, Debtor testified that he withheld payment for two shipments of weaner pigs delivered in January and February of 2001 in order to provoke a discussion with LOLFF. The total cost of the January and February deliveries was $38,310.25.

The evidence suggests that, before deciding to withhold payment for his January and February deliveries, Debtor expressed his dissatisfaction to Mr. Dale Hefel, a representative of Three Rivers Cooperative. Because Debtor's facility was only suitable for feeder pigs, the weaner pigs supplied by LOLFF under the Agreement were initially delivered to Mr. Robert Noonan, a subcontractor of Three Rivers Cooperative. Mr. Noonan tended the pigs until they reached "feeder weight" at which time they were transferred to Debtor's farm. Neither Farmland nor LOLFF has any involvement with Mr. Noonan's operation.

As a representative of Three Rivers, Mr. Hefel made frequent visits to Debtor's farm and advised him on his dealings with both the Three Rivers Cooperative and LOLFF. Although Mr. Hefel was not affiliated with LOLFF in any way, Debtor believed Hefel to be a LOLFF field representative. Debtor stated that he believed this because he made payments to LOLFF through Mr. Hefel and Mr. Hefel frequently inquired about his dealings with LOLFF. Debtor testified that he contacted Mr. Hefel immediately after discovering that batches 22 and 24 were infected with PRRS. Debtor also stated that he made several failed attempts to discuss the "substandard" pigs with LOLFF corporate representatives. Debtor testified that he decided to withhold payment on two subsequent shipments of pigs in order to get the attention of LOLFF.

In August of 2002, LOLFF commenced an arbitration proceeding against Debtor. It sought recovery for the amount remaining unpaid for the January and February deliveries of weaner pigs, plus interest, attorney's fees and costs. Debtor asserted counterclaims against LOLFF for breach of express and

3

implied warranties. Debtor challenged the Agreement's mandatory arbitration clause until the U.S. District Court for the Northern District of Iowa issued an order requiring Debtor to participate in the arbitration proceedings.

An arbitration hearing was scheduled to take place on November 12, 2003. Debtor did not appear at the hearing. The hearing proceeded in Debtor's absence and, on November 18, 2003, the arbitrator issued a "Findings of Fact, Conclusion of Law and Award" ("Award"). <u>See</u> Plaintiff's Exhibit 17. The award dismissed Debtor's counterclaims and awarded LOLFF the sum of $93,639.79. This sum consists of (1) a principal sum of $38,310.25; (2) pre-judgment interest of $18,644.43 (accruing at 18% as provided by the Credit Agreement); (3) attorney's fees incurred by LOLFF of $27,787.50; and (4) other costs of $8,897.61.

Debtor filed his bankruptcy petition on January 14, 2004, two days before a scheduled hearing on LOLFF's application to enter the arbitration Award in Dubuque County District Court. The evidence suggests that LOLFF's arbitration Award and impending judgment was a major factor in Debtor's decision to file for bankruptcy protection.

## CONCLUSIONS of LAW AND ANALYSIS

### § 523(a)(2)(A)

The Bankruptcy Code prohibits "debtors from discharging liabilities incurred on account of their fraud." <u>Cohen v. De La Cruz</u>, 523 U.S. 213, 217 (1998). Here, Plaintiff asks for a finding that its debt is nondischargeable pursuant to § 523(a)(2)(A). This section provides in pertinent part:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A) (2004).

4

Plaintiff must prove the elements of its claim under § 523(a) by a preponderance of evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 285 (1991). Exceptions to discharge must be narrowly construed against the creditor and liberally against the debtor. <u>In re Long</u>, 774 F.2d 875, 879 (8th Cir. 1985). A creditor seeking "such relief bears[s] the burden to affirmatively prove <u>facts</u> to satisfy all of the recognized elements of [its] exceptions." <u>In re Stearns</u>, 241 B.R. 611, 621 (Bankr. D. Minn. 1999) (citing <u>In re Scarborough</u>, 171 F.3d 638, 641 (8th Cir. 1999)) (emphasis in original). These considerations, however, "are applicable only to honest debtors." <u>In re Van Horne</u>, 823 F.2d 1285, 1287 (8th Cir. 1987).

In the Eighth Circuit, a creditor proceeding under § 523(a)(2)(A) must prove the following elements: (1) the debtor made false representations; (2) the debtor knew the representations were false at the time they were made; (3) the debtor made the representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representations, <u>Field v. Mans</u>, 516 U.S. 59, 72 (1995); and (5) the creditor sustained the alleged injury as a proximate result of the representations having been made. <u>In re Wheeler</u>, 317 B.R. 783, 788 (Bankr. N.D. Iowa 2004) (citing <u>Van Horne</u>, 823 F.2d at 1287).

Plaintiff alleges that Debtor acted with fraudulent intent when he "ordered" the January and February deliveries of weaner pigs. Under Plaintiff's theory, Debtor placed a new "order" (incurred a new obligation) for pigs every month under the Agreement. Plaintiff alleges that Debtor's January and February "orders" were fraudulent because he made them with the intent not to make payment.

Given Plaintiff's citation of legal authority and interpretation of the facts, this argument has some initial appeal. <u>See</u> <u>In re Meseck</u>, 284 B.R. 901, 906 (Bankr. N.D. Iowa 2002) (stating that a debtor who purchases goods on credit impliedly represents that he will pay for those goods and that "once the law implies this representation, the first three elements of the § 523(a)(2)(A) test interlock"); <u>In re Mayer</u>, 173 B.R. 373, 377 (Bankr. N.D. Ill. 1994) (an intent to deceive "may be inferred from circumstances indicating that <u>at the time the loan was made</u> the debtor possessed no reasonable intent to repay"; a "long-standing relationship" is evidence of a creditor's justifiable reliance) (emphasis added).

However, the Court concludes that Plaintiff's argument must fail. Plaintiff's argument is based upon the premise

5

that each month's order constituted a severable contract. The Court concludes that this analysis is incorrect. Rather, the weaner pigs were "ordered" at the time the parties executed the Agreement in June of 1999. This result is supported by Section A of the Agreement which states in pertinent part, that the "total number of pigs to be ordered by [Debtor] and delivered by [LOLFF] under this Agreement shall be 13,000 head." Further support for the view that this is a contract in which only one order was placed is found in Section E of the Agreement which provides for liquidated damages in the event of a cancelled shipment.

The conclusion to be drawn from this is that Mr. Gehl did not order the pigs each month. If he had a legal right to order or not order pigs each month, the Agreement would have no reason to provide liquidated damages in the event of a cancelled shipment. The relationship between Debtor and LOLFF did not consist of a series of agreements entered into each month, but rather, it consisted of one Agreement for the purchase of 13,000 pigs which were scheduled for periodic delivery. Thus, the Court must look at Debtor's intent on June 24, 1999. Plaintiff's claim must fail because Debtor clearly did not possess an intent to not pay for the pigs "at the time the loan was made". See Mayer, 173 B.R. at 377. The earliest it can be concluded any fraudulent intent existed would be at the time of the delivery of the January 2001 shipment of pigs.

Even if the Court were to accept Plaintiff's contractual interpretation, the Court must conclude that factually Plaintiff has failed to prove subjective intent to defraud by a preponderance of evidence. The Court finds, as a fact, that at the relevant times in question, Debtor did not possess an intent to defraud LOLFF. The Court is persuaded by the argument that Debtor was attempting to get into a position where he could negotiate a set-off with LOLFF. Clearly, the terms of the contract gave Debtor little bargaining power, but the Court is convinced that Debtor's intentions were to attempt to negotiate compensation for his perceived losses. It is not reasonable to conclude that Debtor accepted these two shipments of pigs thinking that he could or would be able to completely avoid payment. The Court concludes that Plaintiff has failed to show, by a preponderance of evidence, the subjective intent on the part of Debtor to defraud LOLFF.

In summary, Plaintiff has failed to prove at least two elements of § 523(a)(2)(A), i.e. that Debtor made false representations and that Debtor had the intent to deceive Plaintiff. It is the conclusion of this Court that

Plaintiff's claim is not excepted from discharge under § 523(a)(2)(A).

## § 523(a)(6)

Section 523(a)(6) provides that debts for "willful and malicious injury by the debtor to another entity" can be excepted from discharge. 11 U.S.C. § 523(a)(6). "[N]ondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998). A willful and malicious conversion is an "injury" under § 523(a)(6). <u>In re Ziadeh</u>, 284 B.R. 893, 899 (Bankr. N.D. Iowa 2002).

Here, Debtor's actions of withholding payment on two orders of weaner pigs were neither willful nor malicious. As previously stated, Debtor took this action in an effort to negotiate a set-off and not to defraud LOLFF. No matter how unfounded his belief that he was entitled to set-off for the increased loss rate of batches 22 and 24, Debtor's actions were not done with the intent to injure LOLFF. Therefore, Plaintiff's claim is not excepted from discharge under § 523(a)(6).

## § 727(a)(4)(A): FALSE OATH OR ACCOUNT

A debtor who "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account" may be denied a discharge. 11 U.S.C. § 727(a)(4)(A). To prove a false oath, Plaintiff must show by a preponderance of the evidence that (1) Debtor made a statement under oath; (2) that statement was false; (3) Debtor knew the statement was false; (4) Debtor made the statement with fraudulent intent; and (5) the statement related materially to Debtor's bankruptcy case. 11 U.S.C. § 727(a)(4)(A); <u>In re Sendecky</u>, 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002) (preponderance of the evidence is the standard of proof in § 727 complaints); <u>In re Baldridge</u>, 256 B.R. 284, 289 (Bankr. E.D. Ark. 2000) (setting out the elements of a § 727(a)(4)(A) complaint).

Debtors submit bankruptcy statements and schedules on prescribed forms, which require them to verify the averments in them under penalty of perjury. By statute, that has the force and effect of an oath. <u>In re Sears</u>, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000). Whether a debtor presented information with fraudulent intent is a question of fact which must be gleaned from the evidence. <u>In re Brewer</u>, No. 02-02520, slip op. at 5 (Bankr. N.D. Iowa, May 18, 2004).

7

In determining whether a debtor has made a statement with fraudulent intent, courts have stated that the "information must have been omitted or altered with the specific purpose of working a fraud." In re Seablom, 45 B.R. 445, 449 (Bankr. D.N.D. 1984) ("It is not the purpose of section 727 to deny a discharge to a debtor merely because information is missing or inaccurate."). As a debtor is not likely to admit to fraudulent intent, the debtor's course of conduct and surrounding circumstances may also be considered. In re Gray, 295 B.R. 338, 344 (Bankr. W.D. Mo. 2003).

To merit denial of discharge, a debtor's misrepresentation or omission must be material. In re Olson, 916 F.2d 481, 484 (8th Cir.1990).

> The threshold to materiality is fairly low: The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property. The value of omitted assets is relevant to materiality, but materiality will not turn on value. An omission of a relatively modest asset will merit denial of discharge, if done with knowledge and fraudulent intent.

Sears, 246 B.R. at 347 (citations omitted); see also Mertz v. Rott, 955 F.2d 596, 598 (8th Cir. 1992).

Here, Plaintiff alleges that Debtor should be denied a discharge under § 727(a)(4) because he intentionally understated the values of certain assets on his bankruptcy schedules. After reviewing all of the evidence, the Court is unable to conclude that Debtor's valuation of his property was fraudulent. Debtor did not attempt to portray himself as propertyless, nor did he fail to disclose the existence of material assets. While his valuations of certain property were less than their recent appraised values, the values were rationally based. At the hearing, Debtor provided sound explanations for his valuations. While appraised values typically take an optimistic view of an asset's worth, Debtor's bankruptcy schedules and tax forms take a more pessimistic view. The true values of these assets likely fall somewhere in the middle. Therefore, the Court finds that Debtor's statements on his bankruptcy schedules were neither false nor made with fraudulent intent.

**WHEREFORE**, Plaintiff's Complaint is DENIED.

**FURTHER**, Count IV of Plaintiff's Complaint objecting to Debtor Roger Gehl's discharge under § 727(a)(4) is DENIED for the reasons set out herein.

**FURTHER**, Plaintiff's claim is not excepted from discharge under § 523(a)(2)(A) or § 523(a)(6) for the reasons set out herein.

**FURTHER**, Plaintiff's claim for pre-judgment interest and attorney's fees is denied.

**DATED AND ENTERED** _____

_____
PAUL J. KILBURG
CHIEF BANKRUPTCY JUDGE

9